(No. 91465.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. RUDOLFO CARRERA, Appellee.

*Opinion filed December 19, 2002.*

GARMAN, J., joined by FITZGERALD and THOMAS, JJ., dissenting.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Kenneth T. McCurry and Katherine Blakey Cox, Assistant State's Attorneys, of counsel), for the People.

Marc W. Martin and Alexander Salerno, both of Chicago, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Following a stipulated bench trial, the circuit court of Cook County convicted defendant of three counts of possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(B), (a)(2)(C), (a)(2)(D) (West 1996)) and sentenced him to concurrent terms of 15 years of imprisonment. The appellate court found that the police did not have authority to arrest defendant. Consequently, the court reversed the circuit court's

denial of defendant's second motion to quash arrest and suppress evidence and remanded for further proceedings. 321 Ill. App. 3d 582. We granted the State's petition for leave to appeal (177 Ill. 2d R. 315(a)). For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

On August 26, 1997, Chicago police officers conducted surveillance of defendant's home in Franklin Park, Illinois. The officers observed defendant leave his home and drive to a storage facility in Schiller Park, Illinois. Defendant entered the storage facility and returned to his car carrying a bag. Upon his return home, the officers confronted defendant and learned that the bag contained a controlled substance. The officers arrested defendant. Subsequently, defendant signed consent forms for the search of his home and a locker at the storage facility in Schiller Park. The officers recovered controlled substances from defendant's garage and storage locker.

The State charged defendant with three counts of possession of a controlled substance with intent to deliver. Following his indictment, defendant moved to quash his arrest and to suppress the evidence recovered by the police officers. Defendant argued that the officers did not have probable cause to effectuate his arrest. Consequently, defendant maintained, the contents of the bag, as well as certain evidence recovered from his home, garage, and storage locker, should be suppressed.

The circuit court held a hearing on defendant's motion to quash arrest and suppress evidence. At the hearing, defendant testified that on August 26, 1997, he retrieved a brown paper bag from his storage locker in Schiller Park and placed the bag in the trunk of his car. Upon his return home, he exited the car and opened the trunk, intending to remove the bag. However, before he could do so, he saw the police approaching. One police officer told him to put his hands on top of the car. The of-

ficers then grabbed the bag and the car keys and handcuffed him. They asked him whether he lived at the Franklin Park residence and who was inside the house. Upon being told that defendant's wife and three children were inside the house, the officers entered the house with defendant. Once inside the house, the officers had defendant, defendant's wife and their children sit in the living room. The officers threatened that defendant and his wife would be sent to jail and the children removed from their care. The officers asked defendant if he had anything in the house. Defendant replied that he had a scale in the basement, whereupon three officers took defendant to the basement to look for the scale. The officers recovered the scale. They then told defendant that the law required that he sign consent forms for the search of the house and things would be hard for him if he did not. Defendant signed the forms. Back upstairs, the officers searched the house. The officers transported defendant to a Chicago police station.

Rosa Elaina Carrera, defendant's wife, also testified at the hearing. She stated that defendant left the house at 12 p.m. on August 26, 1997. At 12:30 p.m., the door opened and four police officers entered, along with defendant. One officer asked her to bring the children to the living room and sit next to them. He told her that there were some problems and he was going to arrest her. The officers sat defendant in the living room as well. In defendant's presence, the officers told Mrs. Carrera that they were going to arrest her. They also added that they would take her daughters away and she would not see defendant again. The officers then asked defendant what else he had in the house. Defendant replied that he had a scale in the basement. Three officers accompanied defendant to the basement. One officer stayed to watch Mrs. Carrera and the children. While the other officers were in the basement with defendant, the police officer

continued to threaten her. Approximately 20 minutes later, the officers and defendant returned from the basement. The officers proceeded to search the house. Eventually, two other officers arrived at the house. These officers told Mrs. Carrera that they would not take her or the children. Yet later, as the police officers were about to leave the house with defendant, a police officer from Franklin Park arrived at the house.

Officer Joseph DiGiacomo testified next. On August 26, 1997, he was employed by the Chicago police department. He received information that a Hispanic male named Rudolfo, who drove a gray Mercury Marquis, was dealing drugs from his residence at 3112 N. Emerson in Franklin Park. Officer DiGiacomo testified that he, along with Sergeant DeAntonio, Officer Cane, Officer Herrera, Officer Horton, and Officer Rowan, all of the Chicago police department, proceeded to Franklin Park. The officers drove separate cars. Each officer carried a gun, a badge, and a pair of binoculars. The officers communicated via walkie-talkie. In Franklin Park, the officers set up surveillance at defendant's home. At 12:30 p.m., defendant left his home and drove away in a car matching the description provided by the informant. The officers followed defendant to the storage facility in Schiller Park. Shortly after defendant entered the facility, he returned to his car carrying a brown paper bag, which he placed in the trunk of the car. The officers followed defendant back to Franklin Park. The officers had not observed defendant commit any crimes up to this point. Also, the officers had not received any information regarding defendant's use of a storage locker in connection with the alleged sale of drugs at the Franklin Park residence.

Once home, defendant exited the car, opened the trunk and pulled the bag from the trunk. Acting on a "hunch," Officer DiGiacomo and the other officers

"converged" on defendant. Officer DiGiacomo explained that, as he exited his vehicle, he confronted defendant, stating: "Police officer. What do you have in the bag." Defendant replied that he had drugs in the bag and handed the bag to Officer DiGiacomo. Officer DiGiacomo opened the bag and saw what he suspected to be cocaine.[1] Officer DiGiacomo placed defendant under arrest.

Officer DiGiacomo further testified that Officer Herrera advised defendant of his rights in Spanish. Officer DiGiacomo then asked defendant how much more cocaine he had in the storage locker. Defendant replied that he had two kilos of cocaine in the locker. Next, defendant asked to go inside the house.[2] Once inside, defendant signed consent forms in Spanish for the search of the house and storage locker. Officer DiGiacomo recovered suspected cocaine from defendant's garage and storage locker.

Officer Herrera was the last witness at the hearing. He testified that he participated in the surveillance of defendant's home. Upon defendant's return home, the police officers, including Officer Herrera, approached defendant. As he moved towards defendant, Officer Herrera surveyed the area to make sure that everything was secure. Officer Herrera saw defendant hand a brown paper bag to Officer DiGiacomo. The officers then placed defendant under arrest.

Defendant spoke Spanish and only a little English. Officer Herrera, a native Spanish speaker, communicated with defendant in Spanish. Officer Herrera gave defendant the *Miranda* warnings in Spanish. Also in Spanish, defendant indicated that he wanted to get off the street and go inside the house. Once inside the house, defendant

---

[1] As inventoried, the brown paper bag contained a large ziplock freezer bag with a half-brick of compressed white powder wrapped in silver tape.

[2] Officer DiGiacomo did not so indicate in his written report.

spoke to his wife, who gathered the children into the living room. Officer Herrera communicated with defendant's wife in Spanish and stayed with her and the children while the other officers searched the house. Officer Herrera denied ever threatening defendant, defendant's wife or their children.

At the conclusion of the hearing, the court found that the information that the officers had was sufficient to sustain the encounter. The court also found that, upon being approached, defendant volunteered he had drugs in his hands and gave those to Officer DiGiacomo. Lastly, the court found that defendant willingly entered the house in an attempt to remove a potentially embarrassing situation from the street and signed the consent-to-search forms for the premises.

Subsequently, defendant filed a second motion to quash arrest and suppress evidence in which he maintained that the Chicago police officers did not have authority to arrest him outside the territorial limits of the City of Chicago. The State rejoined that the police officers effectuated a valid citizen's arrest. The State maintained that, even though the police officers possessed reasonable suspicion to effectuate a *Terry* stop prior to defendant's actual arrest, defendant did not submit to the officers' authority. Without actual submission to the officers' authority, "no police action occurred until the facts justified a valid 'citizen's arrest.'" The State claimed that "[d]espite defendant's assertions, [the circuit] Court never found any submission by the defendant to police authority prior to his incriminating admissions, nor did [the circuit] Court ever rule that the officer's initial approach constituted a *Terry* stop." In the alternative, the State argued that the circuit court should not suppress the evidence recovered by the police officers because the officers acted in good-faith reliance upon an amendment to the extraterritorial arrest statute, section

7—4—8 of the Illinois Municipal Code (65 ILCS 5/7—4—8 (West 1996)), as amended by Public Act 89—404, effective August 20, 1995. The amendment was declared unconstitutional several months after defendant's arrest.

The circuit court denied defendant's second motion to quash arrest and suppress evidence. The court found that the police officers acted in good faith in effectuating defendant's arrest. The court explained:

"THE COURT: *** It appears to me that when you describe what happened in this case as you counsel described the police, they were not fortuitously in Schiller Park, Franklin Park. They launched an investigation based on some information that they had, and they went out there and they did this surveillance. But at the time that they did that, everyone agrees that that was within their statutory authority as it existed at the time.

Now, because of this single subject problem that the State is currently going through, it turns out that that statute was invalid. But at the time that the police—if you look into the police minds, for example at the time that the police decided okay, we are going to go out to Schiller Park and do this investigation, and in their mind they were of a belief they were not committing misconduct because it was statutorily authorized. So obviously what I am talking about is good faith exception to the exclusionary rule."

The court concluded that the purpose of the exclusionary rule would not be served by suppressing the evidence recovered.

The matter proceeded to a stipulated bench trial. At the conclusion of the trial, the circuit court convicted defendant of three counts of possession of a controlled substance with intent to deliver and sentenced him to concurrent terms of 15 years of imprisonment.

Defendant appealed the denial of his second motion to quash arrest and suppress evidence. He maintained that the police officers did not have authority to arrest him in Franklin Park and did not effectuate a valid citizen's arrest. Defendant also contended that the good-

faith exception to the exclusionary rule should not apply because the amendment to the extraterritorial arrest statute, upon which the officers relied, was void *ab initio*.

The State argued that the police officers effectuated a proper citizen's arrest. The State claimed that defendant voluntarily gave Officer DiGiacomo the bag containing the cocaine. Once DiGiacomo examined the bag, he had reasonable grounds to believe that defendant was committing a crime, as required by the private citizen's arrest statute (725 ILCS 5/107—3 (West 1996)). The State also argued that the officers did not use the power of their office to gather evidence against defendant that would not have been available to private citizens.

The appellate court considered first whether the actions of the police officers constituted a seizure of defendant. The court noted that if a seizure did not occur, the protections of the fourth amendment would not be invoked. Based on the totality of the circumstances, the court found that "there was a sufficient show of authority by the threatening presence of several officers at the time of the encounter to constitute a seizure." 321 Ill. App. 3d at 590. The court also found that the seizure could not be justified as a valid citizen's arrest because Officer DiGiacomo "used the power of his office to collect the evidence necessary to give him reasonable grounds to arrest defendant." 321 Ill. App. 3d at 593. Lastly, the court refused to apply the good-faith exception to the exclusionary rule. The court noted that the amendment to the extraterritorial arrest statute was found to be unconstitutional. Because a statute which is unconstitutional is void *ab initio,* the court stated that it would view the facts of the case as though the statute never existed. 321 Ill. App. 3d at 599. The court suppressed the contents of the bag recovered from defendant and defendant's statement to Officer DiGiacomo that the bag contained drugs. 321 Ill. App. 3d at 599-600. The court

remanded the cause to the trial court for a determination as to whether the illegal arrest tainted the subsequent evidence recovered by the police from defendant's home, garage and storage locker. 321 Ill. App. 3d at 600.

As noted above, this court granted the State's petition for leave to appeal.

## ANALYSIS

In its petition for leave to appeal, the State advanced two arguments for reversal of the appellate court's judgment. First, the State argued that a private citizen, or a police officer who acts outside his territorial jurisdiction and is therefore considered a private citizen, can conduct an investigatory stop based on a reasonable suspicion of criminal activity. Second, the State argued that the good-faith exception to the exclusionary rule should apply where the legislature enacts a statute in violation of the single subject rule and police officers conduct a seizure pursuant to the statute. We granted the State's petition for leave to appeal to consider the arguments presented.

In its brief on appeal, the State abandons its claim that the police officers effectuated a valid citizen's arrest. The State repeats its argument that the good-faith exception to the exclusionary rule is applicable where the police officers rely upon a statute later declared unconstitutional. In addition, the State argues that the exclusionary rule is inapplicable because the police officers did not conduct a constitutionally unreasonable search or seizure, but simply acted outside the territorial limits of the City of Chicago without valid statutory authority to do so.

Noting that the State failed to argue in its petition for leave to appeal that the exclusionary rule does not apply under the circumstances at bar, defendant maintains the State has waived this contention. Pursuant to Rule 315(b) (177 Ill. 2d R. 315(b)), a petition for leave to appeal must contain "a statement of the points relied

upon for reversal of the judgment of the Appellate Court" and "a short argument (including appropriate authorities) stating why review by the Supreme Court is warranted and why the decision of the Appellate Court should be reversed or modified." This court has previously declined to consider points that a party relied upon for reversal in its brief on appeal but failed to include in its petition for leave to appeal. *City of Naperville v. Watson*, 175 Ill. 2d 399, 406 (1997); *People v. Clark*, 119 Ill. 2d 1, 7 (1987); *People v. Anderson*, 112 Ill. 2d 39, 44 (1986).

The State acknowledges that a point not raised in the petition for leave to appeal is waived. However, the State urges this court, in the exercise of its discretion, to consider the argument in question. The State claims this court must first determine whether the exclusionary rule applies before this court can determine whether the good-faith exception to the exclusionary rule applies. The State concludes that because consideration of its argument regarding the exclusionary rule is necessary to consideration of whether the good-faith exception applies, this court should exercise its authority to override application of the rule of waiver.

It is not necessary for us to determine whether the State has waived the argument at issue, as defendant maintains. Nor need we consider whether the alleged waiver must be excused under the circumstances at bar. As discussed below, Illinois law is settled that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority. Thus, full consideration of the State's argument is not a necessary first step to a determination of whether the good-faith exception to the exclusionary rule is applicable.

In *People v. Lahr*, 147 Ill. 2d 379 (1992), this court affirmed the judgments of the lower courts suppressing

evidence the police obtained during the course of an extraterritorial arrest. The defendant was driving in unincorporated Kane County, approximately seven-tenths of one mile outside the Village of Sleepy Hollow. At the time, Officer Beyer of the Sleepy Hollow police department was conducting stationary radar surveillance near that location. Based on a radar reading of the defendant's car, Officer Beyer stopped defendant and issued a traffic citation for speeding. At the time of the arrest, Officer Beyer was in uniform, was driving an official police vehicle, and held himself out to the defendant as a police officer.

Prior to trial, the defendant filed a motion to dismiss the charges against him, predicated on the fact that the defendant was arrested by Officer Beyer of the Sleepy Hollow police department on a road located outside that municipality's boundaries. The circuit court construed the defendant's motion as a motion to quash arrest and suppress evidence. The court granted the motion, finding that Officer Beyer lacked official police authority to arrest the defendant and that the arrest could not be legitimized as a private citizen's arrest. The appellate court affirmed. The court held that the officer used the power of his office to gain access to evidence not available to private citizens. The officer's use of the radar equipment tainted the gathering of the information and its later use against the defendant. *People v. Lahr*, 207 Ill. App. 3d 419, 421 (1991). This court granted the State's petition for leave to appeal.

Initially, this court observed that a police officer acting outside his jurisdiction retains all the rights of an ordinary citizen, including the right to effect a citizen's arrest. *Lahr*, 147 Ill. 2d at 382. This court recognized, however, that, outside his jurisdiction, a police officer's right to arrest is no greater than that of a private citizen. *Lahr*, 147 Ill. 2d at 382-83. Thus, this court stated that

an extraterritorial arrest will not be upheld if in making the arrest the officer uses the powers of his office to obtain evidence not available to private citizens. *Lahr*, 147 Ill. 2d at 383.

This court next considered whether Officer Beyer used the powers of his office in making the arrest. This court rejected the State's argument that because the defendant was driving on an open roadway and because the radar equipment was available to the general public, Officer Beyer did not use the powers of his office to obtain evidence not available to a private citizen. In rejecting this argument, the court reasoned that the use of radar guns for monitoring the speed of traffic is limited to police officers. Therefore, despite the fact that this type of radar equipment was not strictly limited to police officers, its use in this case was an assertion of the officer's police authority. *Lahr*, 147 Ill. 2d at 383-84. The court concluded that the evidence should be suppressed since Officer Beyer was not investigating any particular individual or suspected crime; there was no evidence except the radar which indicated that Officer Beyer had reasonable grounds to believe a crime had been committed; and Officer Beyer did not effectuate a valid citizen's arrest. *Lahr*, 147 Ill. 2d at 386-87.

We note that in *Lahr* we did not have occasion to consider whether the good-faith exception to the exclusionary rule is applicable where police officers effectuate an extraterritorial arrest pursuant to a statute that is later found to be unconstitutional. Citing *People v. Carlson*, 185 Ill. 2d 546 (1999), the State argues that the good-faith exception to the exclusionary rule applies because the police officers did not violate defendant's substantive constitutional rights in effectuating the extraterritorial arrest. While we acknowledge the State's argument on this issue, we choose to resolve this cause on narrower grounds. In our estimation, the result that

we reach is dictated by application of the void *ab initio* doctrine.

Prior to 1995, section 7—4—8 of the Illinois Municipal Code (65 ILCS 5/7—4—8 (West 1994)) authorized the police of any municipality in a police district, defined as the territory embraced within the corporate limits of adjoining municipalities within any county of the state, to go into any part of the district to suppress a riot, to preserve the peace, and to protect the lives, rights, and property of citizens. As amended by Public Act 89—404, effective August 20, 1995, section 7—4—8 of the Code (65 ILCS 5/7—4—8 (West 1996)) gave police officers from any municipality in a police district full authority and power as peace officers and authorized the officers to go into any part of the district to exercise that authority and power. Thus, the amended statute purported to give Chicago police officers authority to go into Franklin Park to effectuate defendant's arrest. In *People v. Reedy*, 186 Ill. 2d 1, 12 (1999), this court held that Public Act 89—404 was adopted in violation of the single subject rule. Subsequently, in *People v. Ramsey*, 192 Ill. 2d 154, 156 (2000), this court stated that Public Act 89—404 is void *ab initio*.

This court has previously explained that a statute which is facially invalid and thus unconstitutional in its entirety is void *ab initio*. See *Ramsey*, 192 Ill. 2d at 156; *In re G.O.*, 191 Ill. 2d 37, 43 (2000) (noting that when an act is held unconstitutional in its entirety it is void *ab initio*); *People v. Cervantes*, 189 Ill. 2d 80, 94 (1999); *People v. Tellez-Valencia*, 188 Ill. 2d 523, 526 (1999); *People v. Gersch*, 135 Ill. 2d 384 (1990). An unconstitutional law confers no right, imposes no duty and affords no protection. *Gersch*, 135 Ill. 2d at 399, citing *People v. Schraeberg*, 347 Ill. 392 (1932). It is as though no such law had ever been passed. *Ramsey*, 192 Ill. 2d at 156; *Gersch*, 135 Ill. 2d at 399. The void *ab initio* doctrine ap-

plies equally to legislative acts which are unconstitutional because they violate substantive constitutional guarantees (*Gersch*, 135 Ill. 2d at 399) and those that are unconstitutional because they are adopted in violation of the single subject clause of our constitution (*In re G.O.*, 191 Ill. 2d at 43). The single subject clause of our constitution regulates the process by which legislation is enacted. *Cervantes*, 189 Ill. 2d at 83; *Reedy*, 186 Ill. 2d at 8. In *Reedy*, 186 Ill. 2d at 13, this court stressed the importance of the single subject clause and the seriousness with which this court regards single subject clause violations. The court reviewed the dual purposes of the single subject clause:

"On one hand, the clause serves to prevent the enactment of legislation that, standing on its own, could not garner the votes necessary for passage. *Johnson* [*v. Edgar*], 176 Ill. 2d [499,] 514 [(1997)]; *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 258 (1992). Indeed, in upholding the mandate of the Illinois Constitution, this court is duty-bound to ensure that the legislature refrains from the ' "practice of bringing together into one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all ***." ' *Fuehrmeyer* [*v. City of Chicago*], 57 Ill. 2d [193,] 202 [(1974)], quoting *People ex rel. Drake v. Mahaney*, 13 Mich. 481, 494-95 (1865).

A second and equally important purpose of the single subject clause is to facilitate the enactment of bills through a legislative process that is orderly and informed. See *Johnson*, 176 Ill. 2d at 514. By limiting each bill to a single subject, each legislator can better understand and more intelligently debate the issues presented by a bill. *Johnson*, 176 Ill. 2d at 514-15. These dual purposes of the single subject clause, therefore, promote direct confrontation and informed discussion of legislative issues submitted for enactment." *Reedy*, 186 Ill. 2d at 13-14.

In light of the serious nature of single subject clause violations, the court concluded these violations are not subject to a harmless error analysis. *Reedy*, 186 Ill. 2d at 16.

As noted above, in *People v. Reedy*, 186 Ill. 2d at 12, this court held that Public Act 89—404 is unconstitutional because it was adopted in violation of the single subject rule. Further, in *People v. Ramsey*, 192 Ill. 2d at 156, this court stated that Public Act 89—404 is void *ab initio*. As of the date of defendant's arrest, the amendment to section 7—4—8 had not been declared unconstitutional. Thus, the State urges application of the good-faith exception to the exclusionary rule. However, to apply the good-faith exception would run counter to our single subject clause and void *ab initio* jurisprudence— specifically, that once a statute is declared facially unconstitutional, it is as if it had never been enacted. *In re G.O.*, 191 Ill. 2d at 43; *Gersch*, 135 Ill. 2d at 390.

The State argues that this court should give legal effect to the historical fact that Public Act 89—404 existed and that the police officers acted pursuant to the amendment to section 7—4—8. We decline to do so. In our estimation, to give effect to the historical fact that the amendment existed at the time of defendant's arrest would effectively resurrect the amendment and provide a grace period (in this case four years between the effective date of the amendment and the date of our opinion in *Reedy* finding Public Act 89—404 unconstitutional) during which our citizens would have been subject to extraterritorial arrests without proper authorization. Our decision not to recognize an exception to the exclusionary rule where a statute is enacted in violation of the single subject clause comports with our jurisprudence that a statute which is facially invalid, and thus unconstitutional in its entirety, is void *ab initio*.

## CONCLUSION

The State has abandoned its position that the police effectuated a valid citizen's arrest. Further, the State acknowledges that the police effectuated an extraterritorial arrest pursuant to an amendment to section 7—4—8

of the Code later held to be unconstitutional. We conclude that the amendment is void *ab initio* and the police officers effectuated an unlawful arrest. Consequently, we affirm the judgment of the appellate court.

*Appellate court judgment affirmed.*

JUSTICE GARMAN, dissenting:

The majority concludes that the extraterritorial arrest of defendant by Chicago police officers was unlawful because the statute authorizing the arrest was enacted in violation of the single subject requirement of the Illinois constitution. 203 Ill. 2d at 14-17. However, the State, as appellant, has not asked this court to answer the question addressed by the majority. Indeed, the State acknowledges that the arrest was unlawful. The narrow question posed by the State as appellant before this court is whether the good-faith exception to the exclusionary rule applies when officers relied on an apparently valid statute when they made an arrest that, while unlawful, did not violate the individual's state or federal constitutional rights. I write separately to clarify a distinction that the majority obscures—the difference between quashing an arrest because it was not authorized by a valid statute and applying the exclusionary rule to suppress evidence that was obtained in violation of a defendant's right to be free from unreasonable search and seizure.

As a threshold matter, the majority does not identify the standard of review it applies. Although a trial court's ruling on a motion to quash arrest and suppress evidence is generally reviewed for manifest error, the parties agree that the issue presented is purely a question of law, subject to *de novo* review. *People v. Krueger*, 175 Ill. 2d 60, 64 (1996). As such, defendant has not disputed the facts presented in the State's brief, nor has defendant questioned the credibility of the officers. Nevertheless, the majority recounts in detail the conflicting testimony before the trial court during the hearing on defendant's

first motion to quash his arrest, at which he argued that the officers lacked probable cause. The trial court denied that motion and defendant did not raise this issue on appeal. It serves no purpose at this stage of the proceedings to recount accusations made by defendant and his wife against the police officers when the accusations were found not credible by the trial court, and particularly when they have absolutely no bearing on the issue we have been asked to decide.

I agree with the majority that the statute upon which the officers relied is void *ab initio* and that the legislative enactment of which this statute was a part is void in its entirety as a result of the single subject violation (203 Ill. 2d at 14). The majority then notes that harmless error analysis is inappropriate, given the serious nature of single subject clause violations. 203 Ill. 2d at 15.

However, if we were to consider whether or not it is necessary to apply the exclusionary rule in this case, we would not be engaging in harmless error analysis. The effect of declaring the statute unconstitutional on single subject grounds is to return the law to the *status quo ante. People v. Ramsey*, 192 Ill. 2d 154, 156 (2000). Thus, the resolution of the question posed by the State is governed by the law that existed prior to the enactment of the flawed statute. As such, we must apply the earlier version of section 7—4—8 (65 ILCS 5/7—4—8 (West 1994)) and the common law of extraterritorial arrests. This does not constitute harmless error analysis; it is simply a matter of determining what remedy, if any, defendant would have been entitled to under previously applicable law.

Defendant suggests that the State has waived its argument regarding the application of the exclusionary rule. Although the State did not include this threshold question in its petition for leave to appeal, I agree with the State that it is necessary to address the applicability

of the rule itself before addressing any exceptions to the rule.

The majority disposes of the exclusionary rule issue by citing this court's decision in *People v. Lahr*, 147 Ill. 2d 379 (1992), for the proposition that "Illinois law is settled that the exclusionary rule is applicable where the police effectuate an extraterritorial arrest without appropriate statutory authority." 203 Ill. 2d at 11. *Lahr*, however, contained no discussion of the exclusionary rule. In fact, the terms "exclusionary rule," "constitution," and "fourth amendment" do not appear in the *Lahr* opinion at all. *Lahr* involved only common law analysis, not the application of state or federal constitutional principles. The sole issue in *Lahr* was not whether evidence should be suppressed but, rather, whether the extraterritorial arrest of defendant was valid. *Lahr*, 147 Ill. 2d at 383.

In *Lahr*, this court acknowledged the general rule that "municipal and county police officers [have] no authority to arrest a defendant outside the territorial limits of the political entity which appointed them to their office." *Lahr*, 147 Ill. 2d at 382. The sole exception to the rule, at common law, was for the fresh pursuit of a suspected felon fleeing the jurisdiction of the arresting officer. *Lahr*, 147 Ill. 2d at 382. Based on section 107—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 107—3), which permits citizen's arrests, the *Lahr* court created a second exception to the general rule of invalidity of extraterritorial arrests. *Lahr* merely established that when outside his jurisdiction, a police officer has the same ability to make a valid arrest as any citizen, no more and no less. *Lahr*, 147 Ill. 2d at 382-83. If an officer making an extraterritorial arrest uses the powers of his office to obtain the evidence justifying the arrest, the arrest cannot be justified as a citizen's arrest. *Lahr*, 147 Ill. 2d at 383.

In the present case, the appellate court concluded, based on *Lahr* and its progeny, that Officer DiGiacomo did use the powers of his office to obtain the evidence that gave him probable cause to arrest defendant and, thus, did not make a valid citizen's arrest. 321 Ill. App. 3d 582, 593-94. Because the State has abandoned its argument that the arrest was valid as a citizen's arrest (203 Ill. 2d at 16), *Lahr* is irrelevant to the issue raised by the State in this appeal. In any event, *Lahr* tells us nothing about the application of the exclusionary rule or any of its exceptions to evidence gathered by a police officer acting outside his jurisdiction.

The majority did not consider the history of the exclusionary rule and the function it serves before concluding that *Lahr* settled this issue. The exclusionary rule is a judicially created device designed to protect fourth amendment rights in general. The rule itself is not a constitutional right, and it is not intended to redress the injury to the privacy of the defendant who has been the subject of the illegal search or seizure, for any "[r]eparation comes too late." *Linkletter v. Walker*, 381 U.S. 618, 637, 14 L. Ed. 2d 601, 613, 85 S. Ct. 1731, 1742 (1965). As the Supreme Court noted in *Mapp v. Ohio*, the rule safeguards fourth amendment rights by deterring police misconduct. It " 'compel[s] respect for the constitutional guaranty' " of freedom from unreasonable search and seizure " 'in the only effectively available way—by removing the incentive to disregard it.' " *Mapp v. Ohio*, 367 U.S. 643, 656, 6 L. Ed. 2d 1081, 1090, 81 S. Ct. 1684, 1692 (1961), quoting *Elkins v. United States*, 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677, 80 S. Ct. 1437, 1444 (1960).

In Illinois, however, this judicially created remedy has been in existence since 1923, when this court declared in *People v. Brocamp*, 307 Ill. 448 (1923), that "there must, of necessity, be a remedy" when the

individual's "constitutional rights were ruthlessly and unlawfully violated" by a warrantless search of his home. *Brocamp*, 307 Ill. at 453-55.

The good-faith exception to the exclusionary rule was first articulated by the Supreme Court in *United States v. Leon* in the context of an officer's good-faith reliance on a search warrant that was later determined to be unsupported by probable cause. *United States v. Leon*, 486 U.S. 897, 919-22, 82 L. Ed. 2d 677, 696-98, 104 S. Ct. 3405, 3418-20 (1984). Because the purpose of the exclusionary rule is to deter police misconduct, and because application of the rule will not serve to deter a police officer who is acting in good faith when he conducts a search pursuant to such a warrant, the Court determined that an exception to the rule was warranted. *Leon*, 486 U.S. at 916-21, 82 L. Ed. 2d at 694-97, 104 S. Ct. at 3417-19 (noting that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity").

This court adopted the *Leon* good-faith exception in *People v. Stewart*, 104 Ill. 2d 463, 477 (1984). However, when the Supreme Court later extended the *Leon* good-faith exception, this court declined to follow. In *Illinois v. Krull*, 480 U.S. 340, 94 L. Ed. 2d 364, 107 S. Ct. 1160 (1987), the Court held that the exclusionary rule does not bar evidence seized by a police officer who reasonably relied, in objective good faith, on a statute authorizing a warrantless administrative search, although the statute was subsequently held unconstitutional on fourth amendment grounds. *Krull*, 480 U.S. at 349-50, 94 L. Ed. 2d at 375, 94 L. Ed. 2d at 1167. In *Krueger*, this court declared a statute allowing police executing a search warrant to make "no-knock" entries under certain circumstances unconstitutional on fourth amendment grounds. *Krueger*, 175 Ill. 2d at 70. Relying on our own state constitution and the long-standing history of the exclusionary rule in

this state, beginning with *Brocamp*, this court found that the exclusionary rule arising from article I, section 6, of the Illinois constitution provides greater protection than the fourth amendment exclusionary rule:

"We are not willing to recognize an exception to our state exclusionary rule that will provide a grace period for unconstitutional search and seizure legislation, during which time our citizens' prized constitutional rights can be violated with impunity. We are particularly disturbed by the fact that such a grace period could last for several years and affect large numbers of people. This is simply too high a price for our citizens to pay. We therefore conclude that article I, section 6, of the Illinois Constitution of 1970 prohibits the application of *Krull*'s extended good-faith exception to our state exclusionary rule." *Krueger*, 175 Ill. 2d at 75-76.

However, the question of whether a search or arrest is legal is entirely separate from the question of whether evidence derived from that search or arrest should be excluded. *People v. Turnage*, 162 Ill. 2d 299, 307 (1994). The exclusionary rule is applicable when suppression of the evidence would further its purpose of deterring further police misconduct (*Leon*, 468 U.S. at 917, 82 L. Ed. 2d at 695, 104 S. Ct. at 3417; *Turnage*, 162 Ill. 2d at 307) or, as this court noted in *Krueger*, when the giving effect to search and seizure legislation that violates the fourth amendment or the state constitution would permit "our citizens' prized constitutional rights" to be violated with impunity (*Krueger*, 175 Ill. 2d at 75).

In the present case, however, the constitutional infirmity in the statute did not spring from any violation of the fourth amendment of the United States Constitution or article I, section 6, of the state constitution. The appellate court concluded that the actions of the Chicago police officers when they approached defendant outside his home constituted a seizure. 321 Ill. App. 3d at 590. I agree. However, the seizure itself did not violate defendant's rights under the state or federal constitutions.

Rather, the officers' actions violated the preexisting statute governing the power of police officers to act outside their assigned district. Unless such a statutory violation is *per se* unconstitutional, or the exclusionary rule is applicable to a statutory, as opposed to a constitutional, violation, any evidence obtained as a result of the seizure need not be suppressed.

The Supreme Court of Colorado addressed this issue in *People v. Vigil*, 729 P.2d 360 (Colo. 1986), where the defendant argued that evidence should be excluded because the Denver police officers who arrested her outside of their jurisdiction violated the state statute governing extraterritorial arrests (8A Colo. Rev. Stat. § 16—3—106 (1986)). The court found "implicit" in the statute "the premise that peace officers may not go outside the territorial boundaries of their authority to arrest suspects except in the limited circumstances described." *Vigil*, 729 P.2d at 365. The intent of the legislature in enacting the statute was to limit police officers "from exercising their arrest powers and their law enforcement efforts" outside their jurisdiction and to "require that local peace officers be advised and participate in the extraterritorial law enforcement activities of other police officers." *Vigil*, 729 P.2d at 365. The Colorado court rejected the idea that violations of the law governing extraterritorial arrests are *per se* unconstitutional. *Vigil*, 729 P.2d at 366. The State, as appellant, argued that the exclusionary rule should apply only when evidence is obtained as a result of a violation of the defendant's constitutional rights and, further, that exclusion should never be available as a remedy for the mere violation of statutory limits on the authority of police officers. *Vigil*, 729 P.2d at 366. After first acknowledging that when the statute governing extraterritorial arrests has been violated by the police, "evidence obtained as a result of the violation should be suppressed if the viola-

tion also infringes a constitutional right of the defendant, such as the right to be free from unreasonable searches and seizures," the court reasoned that willful disobedience of the statute could also be a basis for the exclusion of evidence. *Vigil*, 729 P.2d at 366. A two-step analysis is required. First, if officers have exceeded their statutory arrest authority, the court must determine whether the unauthorized arrest is unconstitutional and, as a result, suppression of any illegally seized evidence is warranted on that basis alone. *Vigil*, 729 P.2d at 366. Second, if there is no constitutional violation, the court must still consider whether the police officers exhibited both a knowing disregard of the territorial boundaries of their authority and a failure to avail themselves of readily available means of legitimizing the extraterritorial arrest, such as seeking the assistance of the local police. *Vigil*, 729 P.2d at 366. "[S]uppression is not foreclosed as a possible remedy for willful violations" of the statute; such violations "will trigger suppression if they are so egregious as to violate the protections against unreasonable searches and seizures." *Vigil*, 729 P.2d at 366-67.

In my opinion, this approach guards against violations of a defendant's rights under the fourth amendment and the Illinois Constitution and against overreaching by the police that falls short of a constitutional violation but is so willful or recurrent that a sanction is required. Applying this approach in the present case, I conclude that the seizure of defendant, while unlawful, did not violate constitutional protections and that there was no willful violation of the governing statute. Indeed, the officers acted entirely in accord with the statute that they reasonably believed to be in effect at the time. Their failure to adhere to an earlier version of the statute that was only later determined to still be in effect cannot, in any sense of the word, be deemed willful.

Such a result is consistent with our prior decisions.

Under our case law, the violation of a statute by the police does not necessarily require that any evidence acquired as a result of the violation be excluded. In *People v. Harris*, 182 Ill. 2d 114, 148-49 (1998), the defendant claimed that he was transferred from the Cook County jail to the custody of the Chicago police department in violation of the Illinois Habeas Corpus Act (735 ILCS 5/10—131 (West 1994)) and the County Jail Act (730 ILCS 125/4 (West 1994)). As a remedy for these violations, he sought suppression of statements he made while in the custody of the Chicago police department, although he did not claim that the questioning by the Chicago police itself violated any constitutional right. We concluded that even if the transfer of custody was unlawful, suppression was not the appropriate remedy because neither of the statutes was "aimed at the sort of police misconduct that would warrant suppression of the defendant's statements." *Harris*, 182 Ill. 2d at 150. In the present case, as in *Harris*, the violation of existing statutory and common law by the police did not violate defendant's constitutional rights and, therefore, the resulting evidence is not tainted. See, *e.g.*, *People v. Burnidge*, 178 Ill. 2d 429, 440-42 (1997) (Freeman, C.J., specially concurring, joined by Bilandic, J.) (noting that because no fourth amendment violation occurred, there is no need to apply the exclusionary rule or any of its exceptions in a case involving a question of evidentiary privilege).

Because I conclude that the exclusionary rule does not apply in this situation in the first place, I would not reach the issue of the good-faith exception. However, even if the exclusionary rule were to apply to evidence obtained following an arrest that is constitutionally valid but statutorily unlawful, the officers' good-faith reliance on the then-applicable statute should permit the evidence to be admitted. *Krueger* does not require otherwise. Our concern in *Krueger* was with a statute authorizing police

conduct that was, in itself, unconstitutional. This case does not pose the same threat to liberty as the statute at issue in *Krueger*, which purported to authorize unconstitutional no-knock entries by the police when executing a search warrant. Recognizing a good-faith exception for action taken by the police pursuant to a statute authorizing certain extraterritorial arrests, but enacted in violation of the single subject rule, would not subject the citizens of Illinois to "a grace period \*\*\* during which time \*\*\* constitutional rights can be violated with impunity." *Krueger*, 175 Ill. 2d at 75-76.

In sum, I would hold that although the seizure of defendant was unlawful, the exclusionary rule does not apply to the bag containing drugs because the seizure did not violate defendant's state or federal constitutional rights and because the police did not act in willful disregard of the applicable statute. Even if the exclusionary rule were to apply in this case, I would admit the evidence under the good-faith exception. Therefore, I respectfully dissent.

JUSTICES FITZGERALD and THOMAS join in this dissent.